UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

---

UNITED STATES OF AMERICA, for the
use of SPRINKLE MASONRY, INC.,

    Plaintiff,

v.

THR ENTERPRISES, INC.,

and

HANOVER INSURANCE CO.,

    Defendants.

Case No.: 2:14cv251
Case No.: 2:14cv252

## MEMORANDUM OPINION AND ORDER

Sprinkle Masonry, Inc., ("Sprinkle"), a masonry contractor, initiated two separate actions against THR Enterprises, Inc., ("THR"), and its surety, Hanover Insurance Company, ("Hanover"), filing both Case No. 2:14cv251 ("Case 251"), and Case No. 2:14cv252 ("Case 252"), on May 30, 2014. Although the cases alleged identical counts—Count I for Breach of Contract, Count II for Unjust Enrichment/Quantum Meruit, and Count III for a Miller Act Claim—the factual allegations differed slightly. Case 251 involved Sprinkle's provision of labor and materials furnished for renovations on Building 584 on Langley Air Force Base. Inclusive of all change orders executed between Sprinkle and THR for Building 584, Sprinkle agreed to provide labor and materials in exchange for $218,635. Sprinkle initiated Case 251 to recover $42,546.40, plus prejudgment interest, that Sprinkle alleged was unpaid and due under the subcontract. Sprinkle claimed that THR had received payment from the government for this work but had failed to pay Sprinkle.

Case 252 involved Sprinkle's subcontract for labor and materials furnished in relation to Building 586 on Langley Air Force Base. After several change orders increased the value of the subcontract, Sprinkle agreed to provide labor and materials for the renovations in exchange for $408,066. Sprinkle initiated Case 252 to recover $71,869, plus prejudgment interest, that Sprinkle alleged was unpaid and due under the subcontract. Identical to Case 251, Sprinkle claimed that THR had been paid by the government for the work but had failed to pay Sprinkle. In response, THR filed a counterclaim on the grounds that Sprinkle had failed to sufficiently account for credits from change orders in its calculation of the final bill; THR claimed that Sprinkle owed THR for overbilling in the amount of $18,000.00.

The parties consented to the jurisdiction of a United States Magistrate Judge, the cases were consolidated, and they subsequently proceeded to trial. The Court now issues the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). *See* Fed. R. Civ. P. 52(a).

## I. FINDINGS OF FACT

### *A. General Findings of Fact*

THR is the prime contractor for the renovation of certain buildings at Langley Air Force Base in Hampton, Virginia. Sprinkle and THR entered into two subcontract agreements for Sprinkle to perform masonry work on Buildings 584 and 586, respectively. The value of original subcontract for Building 584, dated January 23, 2012, was $163,753. The value of the original subcontract for Building 586, dated January 3, 2012, was $167,303. Over the course of the projects, change orders were issued for both buildings changing the scope of Sprinkle's work and increasing the value of the subcontracts. In addition, modifications to the prime contract

between THR and the government were also issued, which reflected changes in the scope of work for the overall project.

Per the subcontract, Sprinkle submitted monthly payment applications to THR on the 25th of the month as work progressed. Then, THR would submit monthly pay applications to government on the 20th of the month, reflecting all work done by its subcontractors. THR was obligated to pay its subcontractors within fifteen days of when THR received payment from government.

Defendant Hanover issued payment and performance bonds for both buildings in the project. Sprinkle is an obligee under the payment bonds and timely filed its claims against the bonds.

### B. *Findings of Fact Related to Building 584*

Sprinkle's scope of work generally required it to repair defects in the brick mortar joints, which is referred to as "pointing" or "tuck pointing," perform brick-work to the new addition on the west elevation, and wash the exterior of the building upon completion. Also included in the original scope of work was a requirement to install through-wall flashing at the windows. Inclusive of four change orders, the subcontract for Building 584 totaled $218,635.

Sprinkle began work on the building in 2012, but before completion, the government issued a stop work order on July 25, 2013. At that time, Sprinkle had not yet completed all of the tuck pointing work on the building, nor had it performed brick-work to the new addition, or washed the building, as required by the subcontract. In addition, after determining that through-

wall flashing was not practical given construction of the brick exterior, this aspect of the scope of work was eventually deleted.[1]

Although the parties' evidence conflicted as to the amount of the work that remained to be completed before the stop work order was issued, the greater weight of the evidence, including the testimony of Sprinkle owner Robert Hedrick, government construction project manager John Rippy, and Sprinkle's masonry and contracting expert Joseph Zeigler, established that 80-85% of the total work required to be performed by Sprinkle was, in fact, performed at the time the government issued its stop work order. Subsequently in September 2014, the government lifted the stop work order. Since then, Sprinkle has offered to return to the job to complete the work on Building 584, but has requested that THR to arrange for the provision of concrete footers so it can perform the brick-work to the new addition at the same time it completes the tuck pointing and washing.

Sprinkle submitted 7 pay applications[2] during the course of work, not all of which have been paid by THR. Those invoices totaled $96,113.20.

---

[1] The government deleted through-wall flashing on Building 586 due to impracticality via Request for Information ("RFI") 17 in March of 2012. However, this task was not officially deleted from Building 584's scope of work until November 2014 through RFI 48.

[2] The parties jointly submitted Exhibit 5, which included Sprinkle payment applications dated 11/25/12, 1/25/13, 2/25/13, 3/25/13, 4/25/13, 5/25/13, and 5/25/13 again (although signed on 6/25/13). In addition to the date error, several of the payment applications were incorrectly numbered. Sprinkle also proffered Plaintiff Exhibit 28, which was Sprinkle's last payment application, dated 7/25/13. Consequently, Sprinkle offered into evidence, without objection, eight payment applications totaling $102,913.20. THR submitted Defendant's Exhibit 12, a December 11, 2014 email from Sprinkle to THR attaching seven corrected payment applications. Those payment applications were dated 11/25/12, 2/25/13, 3/25/13, 4/25/13, 5/25/13, 6/25/13, and 7/25/13. The total amount of these payment applications was $96,113.20. Notably, Sprinkle did not include the 1/25/13 payment application, which was in the amount of $6,800, with this email. Sprinkle also proffered Plaintiff Exhibits 1 and 8, which included summary charts of Sprinkle's payment applications prepared by Elizabeth Bachman, Sprinkle's Office Administrator. The total amount of the payment applications in the summary chart is $96,113.20. Curiously, the payment charts included the 1/25/13 payment application, but did not include 3/25/13 payment application, which was in the amount of $6,640. More curiously, the amount listed in the charts for the 4/25/13 payment application was $160 less than the amount of the payment application itself ($11,095 in the chart viz. $11,255 in the payment application). Not coincidentally, the difference between the 3/25/13 payment application amount omitted from the charts and the 1/25/13 payment application amount included in the charts is $160 ($6,640 viz. $6,800). No evidence or explanation was proffered by Sprinkle as to why the 1/25/13 payment application was not included among those sent

The first six of the payment applications totaled $78,473.20, which is the amount THR reported to the government that it had paid Sprinkle. But in fact, THR had only paid Sprinkle $53,566.80. During the course of this project, THR regularly misreported to the government amounts it had paid to its subcontractor Sprinkle. For instance, by its own payment application to the government, #11006/8, dated September, 2012, THR represented to the government that it had paid Sprinkle $18,207.33. This representation was incorrect, as Sprinkle did not even submit its first invoice to THR until November 25, 2012. THR repeated this misrepresentation to the government in its next payment application, #11006/9, dated November 21, 2012.

In December 2014, after this litigation commenced, THR sent a corrected payment report to the government, changing the amount it reported it had paid to Sprinkle from $78,473.20 to $53,566.80. THR explained to the government that it had withheld payment to Sprinkle because of incomplete work, including failing to repair mismatched brick and not installing through-wall flashing. However, the through-wall flashing was deleted from the scope of work pursuant to RFI 48, a government directive. Additionally, government inspectors accepted Sprinkle's work and did not require that any mismatched brick be repaired or replaced.

Consequently, the Court FINDS that all of Sprinkle's work, for which it had submitted payment applications to THR in the amount of $96,113.20, was completed and accepted by the government. Moreover, Sprinkle's evidence established that the government paid THR for all of the work performed by Sprinkle to date.

---

to THR in December 2014, or why that same payment application was included in the summary charts, but the one from 3/25/13 was not. Consequently, the court FINDS that the summary charts are not reliable, and the Court does not consider them. Further, the Court FINDS that the corrected payment applications, submitted by Sprinkle to THR in December 2014 and offered into evidence by THR as Defendant's Exhibit 12 without objection, are the most reliable evidence of the amounts billed by Sprinkle to THR.

Less than one month before trial, THR paid Sprinkle another $18,301, bringing the total amount paid by THR to $71,867.80. As a result, $24,245.40 of Sprinkle's invoices remains unpaid.

Included in Sprinkle's claim for unpaid invoices is Change Order #4 to the Building 584 subcontract, allowing for $10,000 in "mobilization costs." This amount was allocated to cover Sprinkle's costs in "re-mobilizing," that is, bringing in all of its equipment and setting up again at the jobsite after the government lifted its stop work order. There was conflicting evidence as to whether the mobilization costs were properly attributed to the Building 584 subcontract or the Building 586 subcontract,[3] but the parties did not dispute that Sprinkle was entitled to these costs in any event. The dispute lay, instead, as to when THR was obligated to pay these costs. Given that the mobilization costs are designed to cover Sprinkle's expenses in going back to the jobsite and setting up its equipment, the credible evidence established that those costs are payable when Sprinkle advises THR that it is prepared, and ready, willing and able, to do that very thing.

Sprinkle advised THR, by letter of February 10, 2015, that it was prepared to return to the jobsite to complete its work on Building 584. Sprinkle also advised that it would so return once concrete footers had been put in place to permit Sprinkle to complete the part of the job pertaining to the brick-work to the new addition because placing the concrete footers in not within Sprinkle's scope of work. The credible evidence established that it would not be cost-effective for Sprinkle to return to the jobsite unless it can complete all aspects of its work, including the remaining tuck pointing, and washing and the brick work for the new addition. THR has not yet arranged for the concrete footers to be constructed, and no evidence was

---

[3] The change order reflects that a lump sum of $10,000 was allocated for "miscellaneous expense incurred since the stop work order September 7, 2012." The change order was dated July 25, 2013, which is the date the government actually issued its stop work order on Building 584. The evidence suggested that the stop work order referenced in this change order was actually issued by the government in September 2012 for Building 586.

proffered as to why it had not yet done so. Because this task has not been performed, Sprinkle cannot yet return to the job. Accordingly, Sprinkle has established that it is prepared to return to the jobsite, but is precluded from doing so by THR.

### C. Findings of Fact Related to Building 586

The original subcontract, dated January 3, 2012, called for Sprinkle to perform certain masonry work for which the parties agreed the base amount would be $125,532. Included in this masonry work was a requirement to prepare precast sills and remove and replace window heads and lintels. In addition, Sprinkle agreed to repair 5,000 square feet of exterior brick as required for $41,771, making the total value of the original subcontract $167,303.

The 5,000 square feet of brick repair "as required" meant that the subcontractor would perform whatever repair work was necessary, including replacement of broken bricks, tuck pointing or other repair work, for as much as 5,000 square feet of area. As Joseph Ziegler, Sprinkle's masonry and contracting expert witness explained, the amount bid by the subcontractor was his estimate of what it would cost to perform the necessary repair work for 5,000 square feet, plus a reasonable profit. The subcontractor bid the lump sum amount with the understanding that there was a risk that, if substantial repairs were required, his bid amount might be too low and he would lose money on the contract. Alternatively, the subcontractor would understand that, if substantial repairs were not required, then he would not lose money on his bid. His hope, of course, is that amount bid would cover whatever costs he incurred to repairing up to 5,000 square feet of brick, plus allow him a profit. The bid amount, therefore, was not a "unit price" bid meant to reflect a specific price per square foot of repair.

Had the subcontract meant to solicit a unit price, then such unit price would have been reflected in the bid proposal. It was not. THR calculated that the bid amount of $41,771 for

5,000 square feet of brick repair equaled a unit price of $8.35 per square foot. Consequently, THR contended that Sprinkle was only entitled to payment for the amount of brick repair work actually required to be performed. However, the bid proposal very clearly provides a lump sum amount for the brick repair work. The defect in THR's position is apparent from its argument that Sprinkle only performed 15 square feet of brick repair. Under THR's interpretation, Sprinkle would be entitled to $125.25 under the contract. Given that the parties' determined that mobilization costs alone totaled $10,000, a contract agreement to perform as little as 15 square feet of repair work makes no sense.

Clearly, the government thought 5,000 square feet of repair work would be necessary, and Sprinkle factored in the extent of repair work which might be required when making its $41,771 bid. Had the government, THR, or Sprinkle intended this task to have been bid and awarded as a unit pricing contract, such designation would have been both explicit and apparent on its face. Accordingly, the Court FINDS that this is a lump sum, not a unit price, contract.

On July 30, 2012, the parties executed Change Order # 1 which increased the scope of Sprinkle's work. Specifically, Sprinkle was now required to tuck point, wash, and waterproof the entire building, estimated to be 11,700 square feet. Sprinkle proposed a cost of $261,058 to perform this work, but after negotiations with THR, agreed to perform this work for $232,000. The change order did not reflect any deductions with respect to the original work which had not yet been performed, and Sprinkle's acceptance of the change order amount was based on its belief that the cost of the change order would be added to the $167,303 cost of the underlying

subcontract.[4] In fact, Change Order #1 shows that the $232,000 cost of the expanded scope of work was added to subcontract amount of $167,303 for a new contract sum of $399,303.[5]

Additional change orders added to the scope of work: Change Order #2 added welding 16 ft. angle irons at a cost of $513; Change Order #3 added brick to the existing exterior elevator shaft at a cost of $21,509; and Change Order #5 added "idle time cost for scaffolding and lull" at a cost of $7,000. Also during the project, the government changed the scope of work to eliminate the requirement for lintels and precast sills at the windows. Sprinkle proposed a credit for $20,259 for the elimination of the precast sills and lintels, of which $15,069 was for the elimination of the precast sills, and $5,200 was for the elimination of the lintels. THR subsequently negotiated a credit to the government for this work in the amount of $20,269[6] as part of a contract modification that included other credits and add-ons for other parts of the prime contract for the building renovation project. The government did not seek and is not seeking any further credit for the elimination of precast sills and lintels.

---

[4] Sprinkle's CEO Mr. Hedrick testified, and the Court accepts, that had THR intended that the $41,771 cost of brick repair not be credited to Sprinkle because of the change in the scope of work required by Change Order #1, then Sprinkle would have negotiated a higher cost figure for Change Order #1.

[5] THR proffered as an exhibit a letter from THR Vice President Edward O'Brien to Sprinkle owner Robert Hedrick advising that Sprinkle's $261,058 price proposal was too high, and representing that THR would retain the $41,771 for original brick repair work and instead pay Sprinkle $8.35 per square foot for any work above tuck pointing which required brick repair and replacement. The letter was stamped "MAILED 5/25/12." The Court does not find this letter to be credible. First, Sprinkle originally proposed the $261,058 figure in its own letter of May 22, 2012 which set out the scope of work and clearly proposed the cost would be "for the balance of the building," and thus, added to the original contract price. When THR balked at that price figure, Sprinkle resubmitted the letter on June 5, 2012, with the lower price of $232,000, again proposing the price "for the balance of the building." No reference was made at all to THR's proposal to retain the previously agreed upon amount of $41,771, and instead change the agreement from a lump sum to a unit price contract, which would have been a substantial alteration of the original agreement. THR accepted Sprinkle's proposed price of $232,000. Second, Mr. Hedrick testified convincingly at trial that he never received this May 25, 2012 letter, and if he had, he never would have agreed to THR's proposal. Third, Hugh Delauney, THR's Chief Financial Officer, was not credible in his testimony explaining the origins of the letter. Among other things, Delauney's explanation that, even though Edward O'Brien is the letter's signatory, he actually wrote the letter for O'Brien's signature was unconvincing. Finally, THR's May 25, 2012 letter is the only one out of all of the letters it proffered at trial that was stamped "MAILED." THR failed to explain this unusual circumstance. Consequently, the Court FINDS that the May 25, 2012 letter is not credible evidence.

[6] According to the evidence, Sprinkle's credit proposal of $20,259 instead of $20,269 was a result of a math error.

After negotiating with the government the $20,269 credit for Sprinkle's contract, THR sought to instead recoup $48,404.76 in credit from Sprinkle, ostensibly because this amount more accurately reflected the value of the work that was eliminated. THR contended that the subcontract specifically gave THR the right to issue change orders to reduce the scope of the subcontractor's work. Further, THR contended that it was required to make other sacrifices to its bottom line in order to induce the government to accept its proposed contract modification. In THR's view, all of its subcontractors should have had to share in THR's cost sacrifice. The defect in THR's argument is that, once THR negotiated with the government the specific amount of the credit for the elimination of the precast sills and lintels, THR was not free to exact from its subcontractor a higher credit, allowing it to keep the difference. Mr. Zeigler testified that such conduct would be unethical in the government contracting arena, and it certainly strikes the Court as so. While THR may have made sacrifices to its bottom line in order to advance its overall interests in the prime contract, nothing in the subcontract gave it the right to exact concessions of this sort from Sprinkle.

As a result of the change orders and allotted credit, the subcontract's total value was $408,066. Work on Building 586 was completed, and over the course of the project Sprinkle submitted to THR payment applications totaling $409,216.[7] Though reporting to the government that it had paid Sprinkle $400,616 on the contract, in fact, THR had only paid Sprinkle $337,347. Subsequently, more than a year after work on the building was complete and after this litigation commenced, as it had with respect to Building 584, THR submitted corrected pay applications to the government reflecting the lower amount THR had paid Sprinkle.

---

[7] Satisfactory evidence was not produced at trial explaining why the billed amount was greater than the contract amount, and therefore the Court FINDS that Sprinkle's damages are limited to the contract amount.

All work on Building 586 has been completed and accepted by the government, and the government has paid THR for all of Sprinkle's work. Moreover, unlike Sprinkle's billings for Building 584, Sprinkle's invoices here did not contain errors, and THR was obligated to pay the invoices by August 25, 2013, according to the testimony of Sprinkle's Office Administrator. Of the $408,066 value of the subcontract, Sprinkle has yet to be paid $70,719.

## II. CONCLUSIONS OF LAW

In this action, the Court has subject-matter jurisdiction on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under federal law, specifically alleged violations of the Miller Act. The Court also has subject-matter jurisdiction over Sprinkle's state law claims pursuant to 28 U.S.C. § 1367, which grants district courts supplemental jurisdiction over state-law "claims that are so related to claims in the action within such original jurisdiction [of the district court] that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *see Wis. Dep't of Corrs. v. Schacht*, 524 U.S. 381, 387 (1998). A state-law claim satisfies the "same case or controversy" requirement if it and the federal claim over which the court has original jurisdiction "derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). The Court has general personal jurisdiction over THR and Sprinkle because both are Virginia corporations and personal jurisdiction over Hanover per the surety's business transactions in the Commonwealth. Venue is proper because the events giving rise to Sprinkle's claim occurred in this district. 28 U.S.C. § 1391(b)(2).

Sprinkle brought its action against THR under a breach of contract theory, and, in the alternative, under an unjust enrichment theory. Under Virginia law, a viable breach of contract claim has three elements: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2)

the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). "Under Virginia law, an action for unjust enrichment 'will lie whenever one has the money of another which he has no right to retain, but which *ex aequo et bono* he should pay over to that other.'" *Fed. Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 523 (E.D. Va. 2001) (quoting *State of Qatar v. First Am. Bank of Va.*, 880 F. Supp. 463, 466 n.4 (E.D. Va. 1995)). Therefore, to prove its unjust enrichment claim, Sprinkle must prove first, "that it had a preexisting right to the money," and second, "that the defendant justly should not retain the money." *Id.*[8]

Sprinkle's claims against Hanover are based on the Miller Act, 40 U.S.C. § 3133, *et seq.* "Under the Miller Act, a subcontractor in a federal government project may bring actions against that project's general contractor and surety for claims sounding in contract or quasi-contract." *United States ex rel. Va. Beach Mech. Servs., Inc. v. SAMCO Const. Co.*, 39 F. Supp. 2d 661, 670 (E.D. Va. 1999).

First, the Court FINDS that a valid subcontract existed between Sprinkle and THR obligating Sprinkle to perform masonry repair work on Building 584 on Langley Air Force Base in exchange for a total payment of $218,635. "The law regards the sanctity of contracts and requires the parties to do what they have agreed to do." *First Am. Title Ins. Co. v. First Alliance Title, Inc.*, 718 F. Supp. 2d 669, 674 (E.D. Va. 2010) (quoting *Samuel H. Cottrell & Son v. Smokeless Fuel Co.*, 148 F. 594 (4th Cir.1906)). Pursuant to the terms of the subcontract, Sprinkle was obligated to invoice THR at regular intervals, and upon acceptance by the

---

[8] Importantly, the Court does not reach Sprinkle's claim of unjust enrichment. Because Sprinkle's two claims—breach of contract and unjust enrichment—are mutually exclusive, the Court's finding that THR breached the contract forecloses the potential claim of unjust enrichment. *See Va. Elec. & Power Co. v. Broe Growth Capital LLC*, No. 3:07cv224, 2007 WL 2071726, at *2 (E.D. Va. July 17, 2007) ("[I]f a court finds that an express contract exists between the parties . . . the equitable remedy of unjust enrichment is unavailable.").

government of the work and payment by the government to THR for Sprinkle's invoices, THR was obligated to pay Sprinkle within fifteen days of receiving payment by the government. Having found that Sprinkle's work was accepted by the government and THR was paid for Sprinkle's work through the stop work order issued on July 25, 2013, THR breached the contract when it failed to pay Sprinkle $24,245.40 of the $96,113.20 invoiced. *See United States ex rel. F. E. Robinson Co. of N. C. v. Alpha-Cont'l*, 273 F. Supp. 758, 775-76 (E.D.N.C. 1967) (finding, in part, that contractor breached agreement with subcontractor when contractor failed to make periodic payments as designated in the contract). This amount includes the $10,000 for mobilization costs, since the Court has found that Sprinkle is ready, willing, and able to return to the jobsite, the prerequisite for entitlement to these costs, but is precluded from doing so due to THR's inaction.

Second, the Court FINDS that a valid subcontract existed between Sprinkle and THR obligating Sprinkle to perform certain masonry repair work on Building 586 on Langley Air Force Base in exchange for a total payment of $408,066. Pursuant to the same terms regarding acceptance of the work and payment by the government, THR was obligated to pay Sprinkle's invoices. The work on Building 586 was completed by Sprinkle and accepted by the government. Having found that THR was paid by the government for Sprinkle's work, THR breached the subcontract when it failed to pay Sprinkle $70,719 of the total contract price of $408,066. *See United States ex rel. F. E. Robinson Co. of N.C.*, 273 F. Supp. at 775-76.

As to its counterclaim, THR contended that it was entitled to recoup $48,404.76 in credit for the government's change order eliminating the requirement to install precast sills and lintels on Building 586. However, having negotiated a reasonable credit of $20,269 with the government for this work, approximately the same amount proposed as a reasonable credit by

13

Sprinkle to THR, THR is not entitled to withhold additional money from Sprinkle in order to make up for lost profits on other aspects of THR's prime contract. Masonry and contracting expert Mr. Zeigler testified convincingly that the specific items for which THR sought increased credits, such as the cost of the sills and various labor charges, were not reasonable. Instead, the Court FINDS that the credit negotiated by THR with Sprinkle and the government was reasonable, and accordingly, THR cannot know seek to recoup its losses by demanding a higher credit amount. *See United States ex rel. Coastal Steel Erectors, Inc. v. Algernon Blair, Inc.*, 479 F.2d 638, 641 (4th Cir. 1973) ("[T]he standard for measuring the reasonable value of the services rendered is the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered.") Moreover, THR has pointed to no provision of the subcontract or principle of law that would permit it arbitrarily to increase its profit at Sprinkle's expense.

Additionally, THR contended in its counterclaim that it was entitled to $18,000 in charges for "overbilling." At trial, THR contended that it overpaid Sprinkle by $18,000 because the government had not yet paid THR. However, the Court has found that the government paid THR for all of Sprinkle's work on Building 586, and therefore THR has not overpaid Sprinkle.

As a result, the Court FINDS that, based on THR's breach of contract with respect to Building 584, Sprinkle has been damaged in the amount of $24,245.40, and is entitled to prejudgment interest at the rate of 6% accruing from December 26, 2014[9] through the date of judgment. *See* Va. Code Ann. § 6.2-302 (prejudgment interest at 6% per annum); *United States*

---

[9] Mr. Delauney testified that one reason for THR's untimely payment to Sprinkle was because of the mistakes in Sprinkle's invoices. In light of the Court's review of some of those mistakes and its finding that the invoices submitted by Sprinkle to THR on December 11, 2014 are the reliable evidence of the amounts billed by Sprinkle to THR, *supra* n.2, the Court FINDS that prejudgment interest should be calculated starting fifteen days – the length of time THR had to pay Sprinkle once it was paid by the government – after these corrected invoices were submitted to THR.

*ex rel. SCCB, Inc. v. P. Browne & Associates, Inc.*, 751 F. Supp. 2d 813, 822 (M.D.N.C. 2010) (applying state law to set prejudgment interest in a claim brought under the Miller Act); *Edmonds v. Hughes Aircraft Co.*, No. Civ.A. 1:96–1368–A, 1998 WL 782016, at *2 (E.D. Va. Nov. 6, 1998) (holding that federal courts generally have discretion to determine an appropriate rate of prejudgment interest and may look to state law for guidance). Based on THR's breach of contract with respect to Building 586, the Court FINDS that Sprinkle has been damaged in the amount of $70,719, and is entitled to prejudgment interest at the rate of 6% accruing from August 25, 2013 through the date of judgment.

Sprinkle has also brought claims against Hanover as surety under the Miller Act, 40 U.S.C. § 3133 et seq. A Miller Act claim allows a subcontractor to sue on the payment bond when he "has not been paid in full within 90 days after the day on which the person did or performed the last of labor." 40 U.S.C. § 3133(b)(1). When a subcontractor fully performs its contractual obligations, but the prime contractor fails or refuses to pay the subcontractor for its work, the surety is obligated to pay the compensation provided for in the contract to which the parties have agreed. *United States ex rel. Woodington Elec. Co., Inc. v. United Pac. Ins. Co.*, 545 F.2d 1381, 1383 (4th Cir.1976); *Price v. H.L. Coble Const. Co.*, 317 F.2d 312, 317 (5th Cir.1963) (finding that, when the subcontractor has to sue the surety company, the amount of recovery is measured by the contract sum). Moreover, the Miller Act is "given a liberal construction in order to properly effectuate the Congressional intent to protect those whose labor and materials go into public projects." *United States ex rel. Sunbelt Pipe Corp. v. U.S. Fidelity and Guar. Co.*, 785 F.2d 468, 470 (4th Cir. 1986).

Sprinkle has established that Hanover is the surety for THR, and thus, because the contractor has failed to fully perform its contractual obligations by paying Sprinkle the money it

is owed, the Court **FINDS** that the surety is jointly and severally liable to Sprinkle for the aforementioned damages.

### III. CONCLUSION

Accordingly, the judgment is **ENTERED** in favor of Plaintiff Sprinkle against Defendants THR and Hanover, jointly and severally, in the amount of $94,964.40, plus prejudgment interest.

The Clerk shall forward a copy of this Memorandum Opinion and Order to all parties.

**IT IS SO ORDERED.**

Lawrence R. Leonard<br>
United States Magistrate Judge

Norfolk, Virginia
March 31, 2015